DA 13-0526

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 135

STATE OF MONTANA,

      Plaintiff and Appellant,

  v.

CHRISTINA NADINE NELSON, a/k/a
CHRISTINA NADINE MARK,

      Defendant and Appellee.


APPEAL FROM:    District Court of the Thirteenth Judicial District,
                  In and For the County of Yellowstone, Cause No. DC-12-759
                  Honorable G. Todd Baugh, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

            Timothy C. Fox, Montana Attorney General; Tammy K Plubell; Assistant
            Attorney General; Helena, Montana

            Scott Twito, Yellowstone County Attorney; Mary E. Cochenour, Special
            Deputy Yellowstone County Attorney; Billings, Montana

      For Appellee:

            Penelope S. Strong; Attorney at Law; Billings, Montana


                      Submitted on Briefs:  April 9, 2014
                                Decided:  May 27, 2014

Filed:

               _____
                           Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 The State appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, granting the motion of Christina Nelson (Nelson) to dismiss a charge against her of Tampering with or Fabricating Physical Evidence, a felony, under § 45-7-207(1)(b), MCA. Nelson argued that the Information did not allege a cognizable basis to find probable cause that the charged offense had occurred. We reverse and remand after addressing the following issue:

¶2 *Did the District Court err by dismissing the State's charge of fabricating physical evidence under § 45-5-207(1)(b), MCA?*

## FACTUAL AND PROCEDURAL BACKGROUND[1]

¶3 On August 10, 2012, at approximately 11 p.m., Nelson went to the Billings Clinic to seek medical treatment. She reported to medical personnel that earlier in the day her ex-boyfriend, A.S., had raped her. The hospital staff contacted law enforcement to report the crime. Officer Richardson of the Billings Police Department went to the Clinic to speak with Nelson. Nelson agreed to give a tape-recorded statement of the events that transpired that day. On the recorded statement, Nelson recounted that she left work at approximately 5:30 p.m. that evening. As she was walking through the parking lot, A.S. approached her from behind and told her he missed her and wanted to be with her. Nelson told A.S. to go away and tried to leave. A.S. slapped Nelson in the face, punched her nine times in the stomach, and forced her into the back of his van. Nelson

---

[1] As no trial or other hearing has occurred in this case, the following recitation of facts is as alleged by the State.

2

remembered her pants being off and A.S. having sex with her. After A.S. "finished," he allowed her to leave the van. Nelson then got into her car and left. None of her coworkers were around, and she did not believe anyone had witnessed the incident. After departing in her vehicle, Nelson went to a bar to have a drink with a friend. After leaving the bar, she arrived home at 7 p.m. Nelson and her husband, Miles Nelson (Miles), went to the gym together. While at the gym, Nelson sat in the sauna and hot tub, and took a shower. At approximately 10 p.m., Nelson told her husband about the rape, and he took her to the Clinic.

¶4     At the Clinic, Nelson agreed to submit to a Sexual Assault Nurse Examination (SANE) that is memorialized in a forensic medical report. Nelson signed a consent form allowing medical personnel at the Clinic to obtain Nelson's medical history and details of the alleged attack; perform a physical examination; screen Nelson for pregnancy and sexually transmitted diseases; collect evidence from her person relevant to the alleged rape; photograph any physical injuries; and release all of this information and evidence to law enforcement to facilitate a criminal investigation. Nelson also signed a separate authorization allowing the Clinic to disclose private health care information to the Billings Police Department for the purposes of a "police investigation."

¶5     During the SANE, Nelson was curled up in the fetal position, teary-eyed and soft spoken. Nelson told the nurse conducting the examination substantially the same story as she had told Officer Richardson. When asked about the sexual intercourse she had engaged in during the last five days, Nelson reported that she had engaged in sexual

3

intercourse two days prior, on August 8, 2012, during which a condom was used. Nelson told the nurse she was unsure whether or not A.S. had ejaculated. The nurse found moist secretions in Nelson's vaginal swabs. Law enforcement collected the vaginal swabs and preserved them as evidence in the ongoing investigation.

¶6 On August 28, 2012, Detective Baum of the Billings Police Department interviewed Nelson's husband, Miles. He reported that when Nelson arrived home on August 10, 2012, he did not observe any injuries to Nelson. Miles said that they went to the gym together and returned home at about 8:30 p.m. At that point they engaged in unprotected sexual intercourse, which Nelson initiated. Afterwards, he asked Nelson if something was wrong. At that time, Nelson disclosed to him that A.S. had raped her earlier that day. Nelson apologized for wanting to have sex, but said she just wanted to forget about the rape. Nelson told Miles she only wanted to go to the hospital to get tested for sexually transmitted diseases (STDs). However, according to the SANE report, Nelson refused STD medications.

¶7 During the course of the investigation, Detective Baum obtained surveillance videos of Nelson's workplace parking lot. The videos showed Nelson leaving the building at the end of the day on August 10, 2012. Nineteen seconds after Nelson left the building, Nelson's friend and coworker, Sarah Kruger, also left the building. The video shows both Nelson's and Sarah's vehicles leaving the parking lot at approximately 5:40 p.m. The video does not show anyone approaching Nelson after she exited the building.

4

¶8    Detective Baum interviewed A.S., who Nelson had accused of the crime, on August 29, 2012, and September 5, 2012. A.S. reported that he was not in Billings on August 10, 2012. He left Billings around 8:30 a.m. on August 9, 2012, and arrived in Seattle around 11 p.m. that evening. A.S. provided receipts for purchases made on August 9, 2012, in Billings and Missoula, as well as locations in Idaho and Washington. A.S. stayed in Seattle until August 18, 2012. A.S. provided receipts for purchases made in Washington between August 10 and 16, 2012. He also provided Detective Baum with a photograph on his cellphone of a highway sign on August 9, 2012, showing he was 206 miles from Seattle.

¶9    Detective Baum also learned from the Office of Victim Services that Nelson had previously submitted to four other SANEs, the results of which were in the possession of law enforcement. Two of the examinations and resulting reports occurred in 2009, and two occurred in April, 2012. One of the 2009 examinations, and both of the 2012 examinations occurred in Yellowstone County. In the two 2012 reports, Nelson had reported to law enforcement that she had been assaulted at her residence on Lewis Street in Billings, although the SANE reports indicated that Nelson reported the rapes had occurred in dorm rooms at Rocky Mountain College. Law enforcement further learned that in April 2012, Nelson reported that A.S. had allegedly raped her.

¶10    Detective Baum attempted to contact Nelson numerous times after first meeting with her. On August 29, 2012, Nelson sent Detective Baum an email stating she no longer wanted to pursue charges against A.S., and that she was revoking the medical

5

release she signed at the Clinic. Nelson stated that she had signed the release while on pain medication.

¶11 On December 18, 2012, the District Court granted the State's motion for leave to file an Information charging Nelson with one count of Tampering with or Fabricating Physical Evidence, a felony, in violation of § 45-7-207(1)(b), MCA. The Information alleged that Nelson,

> believing that an official proceeding or investigation was pending or about to be instituted, made, presented or used records, documents, or other things, particularly a forensic medical exam, patient medical disclosure authorizations, and other reports or statements to law enforcement officers and medical professionals, knowing them to be false and with the purpose to mislead law enforcement officers and/or medical professionals, who were engaged in the investigation.

¶12 Nelson requested a continuance of the first jury trial, scheduled for April 22, 2013, and it was subsequently rescheduled for July 23, 2013. On June 17, 2013, Nelson filed a motion to dismiss the charge, asserting that "the current charge of tampering with physical evidence, embodied in the Information and supported by the Supporting Affidavit, is insufficient as a matter of law, and thus the charge must be dismissed." Nelson argued in part that a person's statement, even if recorded electronically or in writing cannot meet the definition of "physical evidence" for purposes of violating the statute. She also argued that nothing in the forensic examination was itself "false"— specifically that Nelson's vaginal secretions were not false. The State opposed the motion.

6

¶13 On July 23, 2013, the District Court issued its order granting Nelson's motion to dismiss the charge. The court's order dismissing the charge stated:

> It is not in dispute that [Nelson] lied to Billings Clinic and the Billings Police Department as to the identity of the perpetrator of the alleged rape. While it is unlikely that [Nelson] was raped or sexually assaulted at all, it is technically possible.
>
> So, if the State believes [Nelson] was raped or sexually assaulted, the charges against [Nelson] at least have an arguable basis. . . .
>
> However, it is apparent the State does not think [Nelson] was sexually assaulted or raped. . . .
>
> Obviously, the State believes [Nelson] to be untruthful about the August, 201[2], events of this case and probably about the 2009 and 2012 reports, as well.
>
> This case turns on M.C.A., §45-7-207(1)(b). Sub-part (b) is the key:
>
> > "[ ] (b) makes, presents, or uses any record, document, or thing knowing it to be false [ ]"
>
> The evidence and arguments clearly establish that [Nelson] knew her allegations of sexual assault and rape were false. Further, by participating in the SANE Report, she helped make records and documents. However, since there was no sexual assault or rape as described by [Nelson], there was no physical evidence of the sexual assault or rape that she described.
>
> Even though [Nelson] was knowingly untruthful about events and arguably with the purpose to mislead, the SANE Report, itself, is not false or inaccurate and is only evidence of [Nelson's] untruthfulness.

(Footnote omitted.) The order concluded that more specific statutes cover the charged conduct such as "perjury, false swearing, unsworn falsification to authorities and false reports to law enforcement." The court granted the State 30 days to amend the charges against Nelson. Instead, the State timely appealed the District Court's decision.

7

¶14 The State argues the District Court's dismissal of the charge in this case is a violation of the discretion afforded to prosecutors in charging decisions. It notes that all of the possible charges referenced by the court as more appropriate under the circumstances are misdemeanors, and given the "extreme measures" Nelson employed to intentionally mislead the investigators, the prosecutor should be permitted to charge a felony offense, if supported under the facts, "based upon the harm Nelson caused, the potential harm she could have caused, and her culpability." Specifically, the State claims the court incorrectly interpreted § 45-7-207, MCA, by concluding that the charge could only be brought if the State actually believed a rape occurred, and by too narrowly defining the term "physical evidence."

¶15 Nelson essentially concedes that the District Court erred in concluding a crime must have been committed before § 45-7-207, MCA, can be violated.[2] Nonetheless, she urges this Court to uphold the dismissal under the "right result, wrong reason" appellate rule, citing *State v. Ellison*, 2012 MT 50, ¶ 20, 364 Mont. 276, 272 P.3d 646; *State v. Marcial*, 2013 MT 242, ¶ 10, 371 Mont. 348, 308 P.3d 69. She argues the evidence alleged by the State in this case cannot be considered "false," nor can it be considered "physical evidence."

---

[2] Nelson does not present argument supporting the District Court's reasoning on this issue, and states "[t]he District Court did rule that as no rape occurred, no physical evidence of such crime was at issue. In so ruling it may have misapprehended the nature of false evidence."

8

## STANDARD OF REVIEW

¶16 We review a district court's decision on a motion to dismiss in a criminal case de novo. *State v. Dugan*, 2013 MT 38, ¶ 13, 369 Mont. 39, 303 P.3d 755. When the dismissal is based upon the interpretation or construction of a statute, we review for whether the district court's interpretation or construction is correct. *State v. Madsen*, 2013 MT 281, ¶ 6, 372 Mont. 102, 317 P.3d 806 (citing *State v. Brown*, 2009 MT 452, ¶ 6, 354 Mont. 329, 223 P.3d 874).

## DISCUSSION

¶17 This Court construes a statute by reading and interpreting the statute as a whole without isolating specific terms from the context, and "must account for the statute's text, language, structure and object." *State v. Triplett*, 2008 MT 360, ¶ 25, 346 Mont. 383, 195 P.3d 819 (quotation omitted). We must attempt to give effect to the purpose of the statute and avoid an absurd result. *Triplett*, ¶ 25. We thus evaluate the Tampering with or Fabricating Physical Evidence statute. Section 45-7-207(1)(b), MCA, provides:

> A person commits the offense of tampering with or fabricating physical evidence if, believing that an official proceeding or investigation is pending or about to be instituted, the person: . . . makes, presents, or uses any record, document, or thing knowing it to be false and with purpose to mislead any person who is or may be engaged in the proceeding or investigation.

The annotator's note explains:

> The purpose of this section is the protection of physical evidence. To this end, the section prohibits . . . the making or presentation of physical evidence known to be false. To establish the offense, it must be shown that the accused believed an official proceeding or investigation was pending or imminent and that he acted either with the purpose of impairing the

9

availability or verity of physical evidence or that he knowingly presented false evidence with the purpose of misleading. It should be noted that to complete the offense the accused need merely do the proscribed acts with the requisite mental state—he need not succeed . . . in misleading the investigation. The most significant differences between this section and prior law are the increase in scope to include investigations as well as trials and other formal proceedings and the increase in penalties from punishment as a misdemeanor to punishment by up to ten years.

¶18 Neither the statute nor the annotations provides support for the District Court's conclusion that § 45-7-207, MCA, is only applicable when the evidence at issue is related to an actual, underlying crime. While a violation of the statute may be charged in cases where the defendant is alleged to have covered up an actual crime, the language of the statute only requires that a "proceeding or investigation" be pending. The annotator's note states that the statute was meant to broaden the scope of prior law by including "investigations as well as trials and other formal proceedings." It is irrelevant whether the State believed that Nelson was actually assaulted because, as explained in the annotator's note, it is not necessary that the defendant charged by this statute actually succeed in misleading the investigation.

¶19 *State v. Clifford*, 2005 MT 219, 328 Mont. 300, 121 P.3d 489, is instructive here. In *Clifford*, the defendant was charged with tampering with or fabricating physical evidence, along with other charges, for creating lewd and threatening letters that were sent to various parties, including the defendant herself. The defendant was vocal in accusing specific people of authoring the letters, and an investigation was conducted of those she falsely accused, including a search of the accused's home pursuant to a warrant. *Clifford*, ¶¶ 9, 14. The investigation revealed evidence implicating the defendant as the

source of the letters, and she was subsequently charged and convicted under § 45-7-207, MCA. While no charges were filed against the falsely accused party, and the defendant had not actually been threatened by anyone since she wrote the letters herself, the conviction was upheld.

¶20    We considered whether a conviction under this statute is permissible when the defendant was acquitted of the underlying crime in *State v. Scheffer*, 2010 MT 73, ¶ 2, 355 Mont. 523, 230 P.3d 462. Scheffer was questioned at the police station regarding allegations of sexual intercourse without consent based upon the victim's report that Scheffer had inserted his fingers into her vagina. *Scheffer*, ¶¶ 3-6. The officer told Scheffer they wanted to swab his fingers to test for the presence of the victim's DNA, to which Scheffer consented. When the officer left the room to gather the swabbing materials, Scheffer stuck his fingers "entirely in his mouth, moved them back and forth, took them out, rubbed his hands together, and then wiped his fingers on his jeans." *Scheffer*, ¶ 8. Scheffer was charged with sexual intercourse without consent and tampering with or fabricating physical evidence. *Scheffer*, ¶ 9. The jury acquitted him of sexual intercourse without consent, but convicted him of tampering. *Scheffer*, ¶ 12. On appeal, we rejected Scheffer's argument that it was a "practical impossibility" for him to tamper with evidence of a non-existent crime, and that the jury "could not have logically concluded that Scheffer attempted to tamper with evidence related to a rape that never occurred." *Scheffer*, ¶ 43.

11

¶21 Thus, the statute may apply in cases where an investigation is pending or imminent yet no underlying crime has actually been committed and no charges are brought against a falsely accused party. Here, the State need only prove that Nelson believed an investigation or official proceeding was about to be instituted, and that she made or presented evidence that she knew to be false with the purpose to mislead the investigation. Thus, we next examine whether the alleged conduct satisfies the remaining statutory requirements.

¶22 The term "physical evidence" is not defined in the statute or anywhere else in the code. "Evidence" is defined as "the means of ascertaining in a judicial proceeding the truth respecting a question of fact, including but not limited to witness testimony, writings, physical objects, or other things presented to the senses." Section 26-1-101(2), MCA. Nelson argues this provision recognizes "four distinct types of evidence," and that writings and witness statements cannot be considered "physical objects, or other things presented to the senses." She thus contends that when the statutes are read together, the term "physical evidence" under § 45-7-207, MCA, specifically excludes oral statements, whether or not recorded, as well as testimony and writings. However, such a narrow construction of "physical evidence" would negate the purpose of the tampering statute and is contradicted by our prior cases.

¶23 In *State v. Staat*, 251 Mont. 1, 822 P.2d 643 (1991), we upheld a conviction for tampering with evidence when the defendant destroyed a note written by a homicide victim. Similarly, in *Clifford*, we upheld the conviction of a defendant for manufacturing

12

threatening letters while alleging that someone else had authored them. In both cases, the documents were clearly writings, and undoubtedly constituted "physical evidence." A writing qualifies as a physical item or object that may be evidence. Similarly, a recorded oral statement, which is necessarily "presented to the senses" when played, § 26-1-101(2), MCA, may be physical evidence in any particular case. Thus, rejecting Nelson's narrow interpretation of what may constitute "physical evidence," we look to the evidence at issue in this case.

¶24 Here, the State alleged that the "forensic medical exam, patient medical disclosure authorizations, and other reports or statements to law enforcement officers and medical professionals" were items of physical evidence that were made, presented, or used by Nelson, knowing that they were false. Nelson argues that her oral statements to the forensic nurse and to law enforcement cannot be considered "physical evidence" even though they were documented in a written SANE report and tape recorded. She also contends the tape recording of her statement by Officer Richardson, the SANE report created by the forensic nurse, and the disclosure forms were not made, presented, or used by her as the statute requires.

¶25 While Nelson's oral statements to law enforcement and medical professionals may not, by themselves, be "physical evidence," Nelson went far beyond merely giving false oral statements. Nelson presented herself for physical examination by a forensic nurse, allowing the nurse to collect bodily evidence and photograph any injuries for use in the sexual assault investigation. The vaginal swabs taken from Nelson were preserved as

13

evidence of the alleged offense, and were potentially admissible as evidence in a trial against A.S. This evidence was collected in this case as a result of Nelson's oral statements claiming she suffered a sexual assault, which cannot be viewed in isolation. Because Nelson is charged with only one count of fabricating physical evidence, we decline to address each specific statement given by Nelson, each form signed by Nelson, and all documents or recordings made during the course of the investigation. Here it is only necessary to focus on the physical evidence produced during the SANE, the collection of which was prompted by Nelson's statements and the documents she signed.[3]

¶26 Nelson offers several arguments for why the swabs cannot be considered "false" for purposes of the statute. First, because it is not alleged that she altered them in some way, she asserts they cannot be considered false "in any sense of that word." Second, because "she did not affirmatively state that A.S. ejaculated into her vagina, but rather said she was unsure," there can be no inference that she "tampered" with her own bodily fluids by having intercourse before going to the hospital. Nelson alleges that her presentation of her body and its fluids "was true, and unimpaired by any obstructive acts that might obliterate their integrity." Because the evidence collected was "fully accurate," A.S.'s "alleged innocence would have been supported by the proper analysis of [Nelson's] vaginal secretions." Finally, she argues that the bodily fluids collected by

---

[3] Nelson argues that by only charging one count, the State did not provide fair warning of the nature of the charged offense. She also makes a cursory argument that by not clearly defining the elements of the crime, the statute is potentially void for vagueness. We decline to address these arguments raised for the first time on appeal and without full briefing. M. R. App. P. 12(1)(f).

14

the swabs "cannot be physical evidence, available for tampering, until and when they are actually drawn for evidence in a criminal case," citing *State v. Peplow*, 2001 MT 253, 307 Mont. 172, 36 P.3d 922.

¶27 Nelson's arguments are unpersuasive. Although Nelson's body and the samples taken therefrom were not "false" in the sense of being forged or fabricated, they were certainly false in what she represented them to be—evidence of a physical assault. She presented herself for examination of an alleged rape by A.S. and represented that the evidence found during the examination would be evidence of the alleged rape. Importantly, she instigated unprotected sexual intercourse with her husband before going to the hospital, thereby enhancing the possibility of the presence of fluids in her body, and then falsely reported to the forensic nurse that her last consensual intercourse had been two days prior, during which a condom was used. This misled the nurse to believe that fluids found during the examination would be related to the alleged rape. Thus, the evidence presented and collected was false for purposes of § 45-7-207, MCA. Nelson's qualified statement that she was "unsure" whether A.S. had ejaculated cannot shield Nelson from these otherwise false statements. Additionally, Nelson's assertion that proper analysis of this evidence would have exonerated A.S. of the alleged assault is irrelevant under the statute, which looks to the defendant's intentions, not her ultimate success. As in *Clifford*, it is irrelevant that further investigation ultimately revealed the accused party's innocence.

15

¶28 Finally, Nelson's reliance on *Peplow* is misplaced. In *Peplow*, we considered whether a defendant's blood, while still in the body, could be considered "physical evidence" of blood alcohol content such that the consumption of alcohol after a motor vehicle accident could be deemed to be tampering with evidence. We concluded it could not be considered physical evidence prior to the removal of a sample from the body. *Peplow*, ¶ 26. We held that this conclusion would avoid the absurd result of "any driver who eats, sleeps, or even receives medical treatment" after an accident being potentially culpable for tampering with evidence. *Peplow*, ¶ 27. Here, even if we were to conclude that the secretions swabbed from Nelson's body were in "a state of biochemical flux," as blood in the veins is, *Peplow*'s rationale would nonetheless fail to apply because the evidence had been removed from Nelson's body, with her consent, and preserved for later testing. These samples are thus "physical evidence" under any interpretation of *Peplow*. Nelson's presentation and the collection of the samples is sufficient to sustain the charge.

¶29 We do not here decide whether Nelson is guilty, but rather, that under the facts as alleged by the State, a rational trier of fact could find the essential elements of the charged offense beyond a reasonable doubt. *See State v. Rosling*, 2008 MT 62, ¶ 35, 342 Mont. 1, 180 P.3d 1102. As alleged, Nelson engaged in unprotected, consensual intercourse with her husband immediately prior to going to the hospital. When she arrived at the hospital she falsely reported that she had been raped and falsely told the nurse that her last consensual intercourse had been two days prior, and that a condom had

16

been used. Nelson agreed to participate in a SANE, during which the nurse collected vaginal secretions indicating recent sexual intercourse that could have been consistent with the rape allegation. The secretions were preserved as evidence. As the State alleges, "Nelson used her own vaginal secretions, which were indicative of recent intercourse, to mislead the nurse and law enforcement to believe that A.S. had raped her." Based on the State's allegations, there are sufficient facts from which a rational trier of fact could conclude that each element of the charged offense had been proven.

¶30 We reverse the District Court's dismissal of the charge under § 45-7-207(1)(b), MCA, and remand for further proceedings consistent with this opinion.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT

17