FILED

08/01/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0298

DA 15-0298

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 185

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

MARK DUANE SHEEHAN,

       Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. BDC 2012-149
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

           Chad Wright, Chief Appellate Defender, Deborah S. Smith, Assistant Appellate Defender, Helena, Montana

      For Appellee:

           Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant Attorney General, Helena, Montana

           Mary E. Cochenour, Assistant Attorney General, Helena, Montana

                    Submitted on Briefs:  June 7, 2017

                              Decided:  August 1, 2017

Filed:

_____
                Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Mark Sheehan received workers' compensation benefits after suffering a job-related injury in 2009. In 2012, the State charged Sheehan with felony theft, by common scheme, for obtaining benefits by means of deception after he allegedly misrepresented the severity of his injury to medical providers. At the close of the evidence, Sheehan moved to dismiss based on insufficient evidence. The District Court denied the motion. The District Court also rejected Sheehan's proposed jury instruction on the termination of benefits under workers' compensation statutes. The jury found Sheehan guilty. On appeal, Sheehan contends that there was insufficient evidence to convict him and that the District Court abused its discretion in rejecting his proposed jury instruction.

¶2 We affirm.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 Sheehan worked as a heavy equipment operator for Riverside Sand and Gravel in Billings, Montana. He injured his left shoulder on October 1, 2009, when his jacket sleeve got caught on the controls as he was exiting an excavator. Riverside's manager, Kenneth Crouse, submitted a "First Report of Injury Form" the next day to the Montana State Fund—Riverside's workers' compensation insurer. Sheehan returned to his home in Plains to recover from the injury.

¶4 The State Fund accepted Sheehan's claim and assigned it to claims examiner Karen Horne. The State Fund began paying Sheehan temporary total disability (TTD)

2

benefits of $1,252 on a bi-weekly basis on October 7, 2009. The State Fund also paid medical services benefits related to Sheehan's injury.

¶5 After returning to Plains, Sheehan went to see Dr. Terry Smith. Dr. Smith initially diagnosed Sheehan's injury as a sprained shoulder. After receiving MRI results, Dr. Smith added a diagnosis of a cervical sprain and a brachial plexus injury. Sheehan saw a physical therapist, Dr. Stanley Stanhope, from October 2009 to January 2010. Dr. Stanhope observed that, throughout the course of therapy, Sheehan demonstrated a limited range of motion and self-reported acute pain symptoms. Dr. Stanhope noted that Sheehan's pain symptoms were "odd," "bizarre," and "rare," given the nature of his injury.

¶6 In January 2010, Crouse conveyed his suspicions to Horne about Sheehan's inability to work and his concerns regarding Sheehan's motivation to return to work. Crouse requested that Horne investigate Sheehan's workers' compensation claim. Horne referred an "activity check" to the State Fund's Special Investigation Unit. The State Fund contracted with a private investigator to monitor Sheehan and observe his activities. The private investigator observed Sheehan twice in early February 2010. The investigator did not observe Sheehan engage in any activities that were inconsistent with his reported injury. Also in early February 2010, Horne contacted Sheehan and told him that Riverside had a modified duty position available. Sheehan said that he would attempt to return to work, but he never did.

¶7 Around that same time, Sheehan began seeing Dr. Michael Righetti, an orthopedic surgeon. Dr. Righetti took a history of Sheehan's symptoms at his initial visit. Dr.

3

Righetti noted that Sheehan's case was "difficult . . . because the symptoms that he was having were confusing." Based on his evaluation of Sheehan, Dr. Righetti ascertained that Sheehan's subjective symptoms did not match the doctor's objective findings. For example, Dr. Righetti noted that Sheehan exhibited "give-away weakness," which he explained "is usually a sign that somebody is trying to show that they are weak, but they may not be weak." Dr. Righetti noted further that Sheehan's injured arm showed no evidence of loss of muscle mass, which he stated would be unusual after five months of alleged non-use since "muscles atrophy considerably" within a week of non-use. Additionally, Dr. Righetti observed that Sheehan displayed "exaggerated expressions of pain."

¶8    Nevertheless, Dr. Righetti believed that Sheehan could have an injury, and he referred Sheehan for a functional capacity exam. The results of that exam, coupled with the results of a nerve conduction study, led Dr. Righetti to conclude that Sheehan suffered from a mild brachial plexus lesion. Dr. Righetti admitted that he "missed the diagnosis originally." Dr. Righetti's letter to Horne following a February 24, 2010 visit with Sheehan acknowledged that his "original impressions are likely to have been inaccurate in that this patient is probably not exaggerating his symptoms." Dr. Righetti set a treatment plan for Sheehan and followed up with him on April 5, 2010. Dr. Righetti's letter to Horne following the April 5 visit confirmed the brachial plexus diagnosis and clarified that the diagnosis "explains his symptoms and the lingering symptoms." In that same letter, Dr. Righetti indicated that Sheehan's symptoms were not yet under control, so Dr. Righetti could not determine what Sheehan was "capable of performing."

4

¶9 Dr. Righetti examined Sheehan again on May 3, 2010, at the request of Horne, to determine whether Sheehan could return to work as an equipment operator. After seeing him, Dr. Righetti determined that Sheehan could not return to work at that time. Dr. Righetti based his opinion on Sheehan's continued complaints of pain and his "expression of an inability to do this job." Dr. Righetti notified Horne of his conclusion, and she requested an alternative job analysis.

¶10 Sheehan saw Dr. Smith again on May 13, 2010. Sheehan expressed concern to Dr. Smith that Dr. Righetti was going to release him to work. Sheehan told Dr. Smith that he had tried operating a mini excavator, but after thirty minutes he was in extreme pain and could barely move his arm. Dr. Smith noted that Sheehan's ability to use his left arm had not improved and that his pain levels were worse than when Dr. Smith initially treated him. Dr. Smith's letter to the State Fund following the visit indicated that Sheehan may "not regain much function of the left arm due to nerve damage."

¶11 Sheehan saw Dr. Righetti the next day. Dr. Righetti concluded that Sheehan was at maximum medical improvement—meaning that Sheehan's injury was not "going to get much better with the treatment options . . . available" and that his "condition [had] established a certain degree of stability." Dr. Righetti determined that Sheehan had a thirteen percent upper extremity impairment and an eight percent whole body impairment due to his injury. Dr. Righetti clarified that he based the impairment rating on the objective findings from the nerve conduction study—not on his physical examinations of Sheehan—and on Sheehan's subjective symptoms, which Dr. Righetti explained were "unsubstantiated by objective findings" and led him to suspect that Sheehan's symptoms

5

"were not valid." Dr. Righetti cleared Sheehan to work with restrictions and recommended no further treatment on his shoulder. Dr. Righetti noted in a letter to Horne regarding his May 14 visit with Sheehan that he did "not have any tapes to observe on [Sheehan] to indicate that his subjective complaints and/or activities outside of the observed medical arena are greater than one would expect for his complaints of pain."

¶12 Less than two weeks later, the private investigator took video of Sheehan helping to construct a family friend's cabin. The videos showed Sheehan hammering, removing concrete forms, lifting and carrying multiple pieces of plywood, and operating a skid steer. While working on the cabin, Sheehan demonstrated a full range of motion in his left shoulder. The private investigator took another video of Sheehan working at the same construction site on June 28. The video showed Sheehan starting a pull-start chain saw with his left arm, using the chain saw to cut logs above his shoulder-height, carrying a ladder with his left arm, and operating a skid steer.

¶13 When Horne received the May videos, she sent them to Dr. Righetti. After reviewing the videos, Dr. Righetti sent a letter to Horne. Dr. Righetti noted that Sheehan's "representation and reported abilities in [Dr. Righetti's] office are not consistent with his activities on the video." Dr. Righetti noted further that the video demonstrated a number of inconsistencies and misrepresentations Sheehan made regarding his activity limitations and actual capabilities. The doctor pointed out, for instance, that Sheehan stated that he could not use equipment because the movement of his arm caused him extreme pain, but the videos showed him operating a skid steer. Dr. Righetti stated that he "did not notice pain behaviors as [Sheehan] represented in [his]

6

office" and that Sheehan's "range of motion appeared almost normal." Based on his review of the videos, Dr. Righetti concluded that Sheehan was "misrepresenting his condition" and that "he would be able to return to work as an excavator operator."

¶14 After receiving Dr. Righetti's letter, Horne sent Sheehan a fourteen-day notice that the State Fund would be discontinuing Sheehan's TTD benefits. The State Fund closed Sheehan's claim on July 8, 2010, and he stopped receiving benefits. In total, the State Fund paid Sheehan $24,593 in TTD benefits and $22,273 in medical services benefits.

¶15 In May 2012, the State charged Sheehan with theft, by common scheme. The State alleged that from May 3, 2010, to July 8, 2010, Sheehan "collected approximately $5,991 in TTD benefits from Montana State Fund while he was misrepresenting his physical capabilities to medical providers." Dr. Smith, Dr. Stanhope, and Dr. Righetti— among others—testified during the four-day jury trial. Before the case went to the jury, Sheehan orally moved to dismiss based on insufficient evidence. The District Court denied his motion. The court also rejected Sheehan's proposed jury instruction on § 39-71-609, MCA (2009), which governs the termination of TTD benefits.[1] Although settlement of jury instructions took place off the record, the District Court allowed Sheehan's counsel to state his objection to the rejected instruction on the record.

---

[1] The workers' compensation statutes in effect "at the time of an injury govern[ ] the claim." *Wiard v. Liberty Northwest Ins. Corp.*, 2003 MT 295, ¶ 21, 318 Mont. 132, 79 P.3d 281. Similarly, the version of the criminal statute "in effect at the time the crime was committed" controls throughout the prosecution. *State v. Daniels*, 2003 MT 30, 314 Mont. 208, 64 P.3d 1045. All references to Montana Code Annotated sections are to the 2009 versions of the statutes.

¶16 The jury convicted Sheehan of felony theft, by common scheme. The District Court imposed a deferred sentence of six years and ordered Sheehan to pay restitution to the State Fund in the amount of $5,991.44, plus a ten percent restitution fee. On June 2, 2015, we granted Sheehan leave to file an out-of-time appeal.[2]

## STANDARD OF REVIEW

¶17 We review questions on the sufficiency of evidence in a criminal case to determine whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Spottedbear*, 2016 MT 243, ¶ 8, 385 Mont. 68, 380 P.3d 810. We review a jury's verdict to determine whether sufficient evidence exists to support the verdict, not whether the evidence could have supported a different result. *Spottedbear*, ¶ 8. It is within the province of the jury to weigh the evidence based on the credibility of the witnesses and determine which version of events should prevail. *Spottedbear*, ¶ 8.

¶18 A district court's statutory interpretation constitutes a conclusion of law, which we review for correctness. *State v. Shively*, 2009 MT 252, ¶ 13, 351 Mont. 513, 216 P.3d 732. Similarly, this court reviews for correctness the legal determinations a lower court makes when giving jury instructions, including whether the instructions, as a whole, fully and fairly instruct the jury on the applicable law. *State v. Lackman*, 2017 MT 127, ¶ 8, 336 Mont. 6, 395 P.3d 477. District courts are given broad discretion when instructing a

---

[2] The District Court revoked Sheehan's deferred sentence after Sheehan failed to abide by two conditions of his sentence. Sheehan does not challenge the revocation of his deferred sentence on appeal.

jury; reversible error occurs only if the instructions prejudicially affect a defendant's substantial rights. *Lackman*, ¶ 8. A district court's decision on jury instructions is presumed correct, and the appellant has the burden of showing error. *Lackman*, ¶ 8.

**DISCUSSION**

¶19 *1. Whether the State presented sufficient evidence that Sheehan obtained unauthorized control over workers' compensation benefits by means of deception.*

¶20 Sheehan contends that there was insufficient evidence to convict him of theft by common scheme because he was authorized under Montana's workers' compensation statutes to receive TTD benefits until July 8, 2010. He argues that the State could not show that he obtained unauthorized control over the TTD benefits because the State Fund was statutorily required to go through certain procedures before terminating his benefits—procedures the State Fund had not complied with by May 3, the first date he was charged with receiving unauthorized benefits. Sheehan observes that it is undisputed that he was entitled to receive TTD benefits prior to May 3. In order to be eligible for TTD benefits in the first place, Sheehan points out, he had to meet the requirements of § 39-71-701, MCA. Once he qualified for TTD benefits, Sheehan contends, he was authorized to receive those benefits until the State Fund complied with the statutory requirements for terminating them.

¶21 The Workers Compensation Act requires the State Fund to give an injured worker fourteen days' notice before terminating the worker's TTD benefits. Section 39-71-609(1), MCA. Sheehan posits that § 39-71-609(2), MCA, placed additional restrictions on terminating his benefits because Dr. Righetti determined, based

9

on objective medical findings, that Sheehan had suffered permanent partial impairment from his injury. Therefore, Sheehan contends, his "TTD payments lasted until July 8, 2010, not because of [his] alleged misrepresentations, but because by law the State Fund could not terminate his benefits until it fully complied with [statutory criteria], and provided a 14-day notice of benefit termination pursuant to Mont. Code Ann. § 39-71-609(1), (2)." Sheehan asserts that his receipt of TTD benefits was authorized up until the point the State Fund completed these statutory prerequisites. Accordingly, Sheehan argues that he could not be guilty of theft under § 45-6-301(5)(b), MCA, because the State could not demonstrate that he obtained unauthorized control over the TTD benefits he received from May 3 through July 8.

¶22 The theft statute provision under which Sheehan was charged provides, in pertinent part, that "[a] person commits the offense of theft when the person purposely or knowingly obtains or exerts . . . unauthorized control over any part of any benefits provided under Title 39, chapter 71, by means of . . . deception or other fraudulent action." Section 45-6-301(5)(b), MCA. We construe § 45-6-301(5)(b), MCA "according to the plain meaning of its language." *Lackman*, ¶ 15 (citation and internal quotations omitted). In so doing, "[w]e must attempt to give effect to the purpose of the statute and avoid an absurd result." *State v. Nelson*, 2014 MT 135, ¶ 17, 375 Mont. 164, 334 P.3d 345.

¶23 Sheehan stresses that § 45-6-301(5)(b), MCA, includes the Workers' Compensation Act within its terms—thereby incorporating the Act's processes of administering and terminating benefits. Contrary to Sheehan's arguments, however, the

10

statute's reference to Title 39, chapter 71, does not mean that administrative requirements of the workers' compensation system are included in the elements of § 45-6-301(5)(b), MCA. Rather, subsection 5 establishes a separate offense of theft based on the defendant's wrongful receipt—or helping another to receive—"benefits provided under Title 39, chapter 71." Section 45-6-301(5)(b), MCA. In other words, the statute's reference to Title 39, chapter 71, simply specifies that workers' compensation benefits are the subject of the theft.

¶24 The plain language of § 45-6-301(5)(b), MCA, requires the State to prove the following elements: that the defendant "obtain[ed] or exert[ed] . . . unauthorized control over any part of any" workers' compensation benefits; that the defendant did so "by means of . . . deception or other fraudulent action"; and that the defendant acted "purposely or knowingly." Section 45-6-301(5)(b), MCA. The State Fund's compliance with statutory requirements for terminating TTD benefits, such as providing the claimant with fourteen days' notice, has no bearing on whether a defendant obtained "unauthorized control" of those benefits by deception or fraudulent action. Section 45-6-301(5)(b), MCA. The purpose of § 45-6-301(5), MCA, is to deter people from obtaining workers' compensation benefits through false statements, deception, or fraud. If a person purposely or knowingly engages in such conduct, he has committed theft.

¶25 To conclude that a defendant cannot exert unauthorized control over workers' compensation benefits under § 45-6-301(5)(b), MCA, until the State Fund has completed the statutory process for terminating those benefits would not give effect to the statute's purpose, and it would lead to an absurd result. As Sheehan emphasizes, once the State

11

Fund has awarded TTD benefits, it generally cannot terminate those benefits or convert them to permanent partial disability benefits until it provides fourteen days' notice and fully complies with certain criteria. Section 39-71-609, MCA. Those criteria require physicians to make the following determinations: "that the claimant has reached medical stability"; "the claimant's physical restrictions resulting from the industrial injury"; and "that the claimant can return to work, with or without restrictions, on the job on which the claimant was injured or on another job for which the claimant is suited by age, education, work experience, and physical condition." Section 39-71-609(2), MCA. Making those determinations necessarily requires the claimant to be forthcoming with her physician.

¶26    Under Sheehan's interpretation, a claimant who misrepresents the nature of his injury to a physician could not be prosecuted under § 45-6-301(5)(b), MCA, as long as the claimant was "authorized" to receive benefits under the workers' compensation statutes. The claimant would be "authorized" to receive workers' compensation benefits until the State Fund met the statutory criteria for terminating or converting benefits, based in part on a physician's findings. Sheehan's interpretation of § 45-6-301(5)(b), MCA, would foreclose prosecution of a person who obtains workers' compensation benefits by means of deception or fraud as long as the State Fund had not yet completed the required termination process, even when the claimant—by deceiving his physician—prevented the State Fund from knowing that it should terminate his benefits.

¶27    Sheehan's interpretation of § 45-6-301(5)(b), MCA, is illogical because once the State Fund complies with the statutory criteria for terminating TTD benefits, the claimant no longer receives those benefits. If a claimant is not receiving workers' compensation

12

benefits, the claimant cannot be guilty of "obtain[ing] or exert[ing] unauthorized control over any part of any benefits provided under Title 39, chapter 71." Section 45-6-301(5)(b), MCA. Sheehan's interpretation of § 45-6-301(5)(b), MCA, would effectively nullify the statute because a claimant always would be "authorized" to receive workers' compensation benefits up until the point she no longer received workers' compensation benefits.

¶28 Processes established in the Workers' Compensation Act are not incorporated into the elements of § 45-6-301(5)(b), MCA. But the State did have to prove each element of the theft offense by sufficient evidence beyond a reasonable doubt. The elements of § 45-6-301(5)(b), MCA, "are factual in nature and their existence must be determined by the jury." *Spottedbear*, ¶ 23 (citation and internal quotations omitted).

¶29 Sheehan presented evidence that he did not obtain the TTD benefits by means of deception or fraud from May 3 to July 8. He stressed that Dr. Smith and Dr. Righetti diagnosed him with a brachial plexus injury and that both doctors acknowledged that his injury could explain his symptoms. Our inquiry on appeal, however, is "not whether the evidence could have supported a different result," but whether "sufficient evidence exists to support the verdict." *Spottedbear*, ¶ 8. Dr. Stanhope and Dr. Righetti both testified as to their doubts regarding Sheehan's self-reported pain symptoms. Dr. Smith acknowledged that Sheehan's representations to him did not match the activities in which Sheehan was engaged in the videos. Those videos, played to the jury, showed Sheehan seemingly using his arm pain-free to build a friend's cabin a few weeks after representing both to Dr. Smith and to Dr. Righetti that his pain was too great to allow his return to

13

work as an equipment operator. The jury weighed the conflicting evidence and determined that Sheehan had obtained the TTD benefits by means of deception or fraud. "Such a determination is exclusively within the province of the trier of fact." *Spottedbear*, ¶ 32 (citation and internal quotations omitted).

¶30 We conclude, viewing the evidence in the light most favorable to the prosecution, that any rational trier of fact could have found beyond a reasonable doubt that Sheehan obtained the TTD benefits by means of deception or fraud from May 3 to July 8. Accordingly, the State presented sufficient evidence to convict Sheehan under § 45-6-301(5)(b), MCA.

¶31 *2. Whether the District Court abused its discretion in rejecting Sheehan's proposed jury instruction on the termination of workers' compensation benefits under § 39-71-609, MCA.*

¶32 Sheehan again argues that he could not have obtained "unauthorized control" of the TTD benefits until the State Fund complied with § 39-71-609, MCA. As such, he contends that the District Court's rejection of his jury instruction regarding the termination of workers compensation benefits under § 39-71-609, MCA, "caused the jury not to be instructed on the law governing termination of workers' compensation benefits as it relates to the elements of felony theft." Moreover, Sheehan asserts, without an instruction on § 39-71-609, MCA, "the jury could not ascertain whether Mr. Sheehan had obtained or exerted unauthorized control of his TTD benefits, in violation of Mont. Code Ann. § 45-6-301(5)." Accordingly, Sheehan argues, the court's rejection of his instruction prejudicially affected his right to a fair trial and the District Court therefore abused its discretion in rejecting his proposed instruction.

14

¶33 As demonstrated above, whether the State Fund complied with statutory procedures for terminating Sheehan's TTD benefits has no bearing on whether Sheehan obtained unauthorized control over those benefits by means of deception or fraud under § 45-6-301(5)(b), MCA. The District Court correctly concluded as much in rejecting Sheehan's proposed instruction regarding § 39-71-609, MCA. The District Court instructed the jury that in order to convict Sheehan, the State had to prove the following elements:

> 1. That the Defendant obtained or exerted unauthorized control over any part of any benefits exceeding $1,500 in value provided under the Worker's Compensation Act;
>
> AND
>
> 2. That the Defendant acted purposely or knowingly;
>
> AND
>
> 3. That the Defendant obtained or exerted control by means of deception or other fraudulent action.

The court further instructed the jury on the meaning of "obtains or exerts control," "deception," and when a person acts purposely or knowingly. A court fulfills its duty to instruct the jury on each theory that finds support in the record "by giving instructions which accurately and correctly state the law applicable in a case." *State v. Kaarma*, 2017 MT 24, ¶ 26, 386 Mont. 243, 390 P.3d 609 (citations and internal quotations omitted). The District Court's instructions fully and fairly instructed the jury on the applicable law.

15

¶34 Sheehan has failed to satisfy his burden of demonstrating that the District Court erred in instructing the jury. Accordingly, we conclude that the District Court did not abuse its discretion in rejecting Sheehan's proposed jury instruction on the termination of workers' compensation benefits under § 39-71-609, MCA.

## CONCLUSION

¶35 We affirm Sheehan's conviction of theft under § 45-6-301(5)(b), MCA.


/S/ BETH BAKER


We Concur:

/S/ LAURIE McKINNON
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE


Justice James Jeremiah Shea, concurring.

¶36 I concur fully in the Court's Opinion. I write separately only to address Sheehan's attempt to conflate the circumstances that gave rise to his prosecution for felony theft with the process by which injured workers legitimately receive TTD benefits, and the legitimate process by which those benefits may be terminated or converted. In my view, our rejection of Sheehan's argument reflects nothing more than a rejection of that conflation. It thus bears reemphasizing that Sheehan's criminal liability had nothing to do with the mandatory statutory process by which his TTD benefits were terminated. Rather, as the Court correctly emphasizes, it had to do with the manner by which a rational trier of fact could have found Sheehan obtained those benefits during the period

16

charged—that being, by means of deception or fraud. Absent evidence that Sheehan purposely or knowingly obtained the benefits by means of deception or fraud, there would have been no basis for a criminal charge. Opinion, ¶ 24.

¶37 As the Court correctly notes, when an injured worker is awarded TTD benefits, certain criteria must be met before those benefits may be terminated or converted. Opinion, ¶ 25. These statutory criteria are intended to ensure that a worker's TTD benefits are not terminated or converted without adequate investigation into the worker's physical and vocational limitations and his ability to return to work. They are not, as Sheehan's defense would suggest, a grant of immunity from criminal liability. As the Court correctly notes, if we were to accept Sheehan's interpretation of the statute, it would lead to an absurd result. Opinion, ¶ 25. I concur.

/S/ JAMES JEREMIAH SHEA