Ingrid Gustafson, J., delivered the Opinion of the Court.
*61 ***10 ¶ 1 Appellant Dennis Cromwell, the natural father of A.J.C. (Father), appeals the September 26, 2017 Order Denying Department's Motion to Amend the Permanency Plan and Order of Dismissal, in which the Twentieth Judicial District Court, Sanders County, determined it was in A.J.C.'s best interest to reside with his maternal grandmother (Grandmother) and denied the Department's motion to place A.J.C.
***11 with Father.
¶ 2 We restate the issue on appeal as follows:
Did the District Court violate Father's constitutional right to parent by denying Father his fundamental right to care and custody of his child throughout this dependent neglect proceeding and thereafter by permanently placing A.J.C. in the primary care of his grandmother and dismissing this proceeding?
FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 On September 22, 2014, when A.J.C. was 11 years old, the Department of Health and Human Services, Child and Family Services Division (Department), filed a Petition for Emergency Protective Services (EPS) and Temporary Investigative Authority (TIA) in this dependent neglect (DN) matter. The Department had received several reports regarding A.J.C.'s mother (Mother) related to drug use, abuse, and distribution, and domestic violence. Although Mother had legal custody of A.J.C., he was frequently in Grandmother's care. Father, who resided in Oregon, had not participated in parenting A.J.C. to any significant degree and had provided only limited support. Father had only seen A.J.C. in person a few times although he occasionally spoke to him via telephone.
¶ 4 After the Department became formally involved with Mother, it formally placed A.J.C. in Grandmother's care. When Father learned of the Department's involvement, he acted to gain custody of A.J.C. On October 14, 2014, at the Department's direction, Father petitioned the District Court under an action separate from this DN action for a parenting plan designating him as A.J.C.'s primary residential parent.[1]
¶ 5 On November 3, 2014, the District Court granted the Department's petition for EPS and TIA. On November 24, 2014, Father moved for directed disposition and dismissal of this action. Father asserted he was prepared to parent A.J.C. and argued that as the non-custodial parent, he was entitled to immediate placement. Father further argued that Grandmother had failed to protect A.J.C. from Mother's neglect. The Department objected, contending Father had an insufficient relationship with A.J.C. and immediate transfer of care would force A.J.C. to change schools in the middle of the school year.
***12 The Department further expressed concern that Father had a criminal history and a previous history of child protective services (CPS) involvement. The Department argued that the District Court should allow it to further investigate the appropriateness of placement with Father before removing A.J.C. from Grandmother's care.
¶ 6 The Department then petitioned for adjudication of A.J.C. as a youth in need of care (YINC) and asked the District Court to grant it temporary legal custody (TLC). On January 13, 2015, the District Court denied Father's motion for directed disposition and dismissal. Shortly thereafter, the District Court adjudicated A.J.C. as a YINC and granted TLC to the Department.
¶ 7 On May 26, 2015, the District Court approved a treatment plan for Father.[2] The plan required three tasks: (1) maintain regular contact with A.J.C.; (2) cooperate with an interstate compact (ICPC) home study; and (3) maintain regular contact with the Department. The treatment plan's purposes were: to *62 strengthen the parent-child relationship; to provide the Department with the necessary information to determine if it was safe to place A.J.C. in Father's care; to achieve reunification and establish a permanency plan; and to determine if Father could provide a stable lifestyle.
¶ 8 On July 17, 2015, the Department petitioned to extend TLC. The Department acknowledged that Father had maintained regular contact with it and with A.J.C., was cooperating with the ICPC home study process, and was hosting A.J.C. for a six-week visit. However, it alleged Father had not made sufficient progress on his treatment plan for the Department to transfer A.J.C. to his care because the ICPC home study was not yet complete. Father objected to the extension of TLC, noting that A.J.C. was doing well during his current visit. Father also contended the ICPC home study was completed without identification of any significant issues although a written report had not yet been produced. He asked the District Court to allow A.J.C. to remain in his care.
¶ 9 On July 31, 2015, the ICPC home study report approved Father as a placement for A.J.C., noting that Father had made the necessary changes to his lifestyle to allow him to care for A.J.C., and that he was "ready, willing and able" to do so. Thus, by July 31, 2015, Father had indisputably completed all of his treatment plan's tasks.
¶ 10 On August 11, 2015, the District Court granted the Department ***13 extension of TLC. Although Father had already completed his treatment plan's tasks, the court nonetheless found that Father needed additional time to complete his treatment plan. Even though the ICPC home study report had been issued over a week earlier, the court ruled, "In order for the child to be returned home to birth father, the ICPC home study must be completed with no concerns or any concerns in the ICPC must be addressed."
¶ 11 On September 8, 2015, the District Court conducted a hearing to determine A.J.C.'s placement. The court spoke with A.J.C. alone and off-the-record in chambers. It then heard the parties' arguments. The Department objected to placing A.J.C. with Father even though the ICPC home study had approved placement, asserting it wanted additional time to obtain more information about Father. The Department alleged Father had an anger management issue that required further examination. The Department also urged the court to consider A.J.C.'s opinions in determining his placement.
¶ 12 Johnathan Nelson, a child protection specialist at the Department, testified he had interviewed A.J.C., and A.J.C. had expressed a preference for living with Grandmother. Nelson testified that the Department's only concern in placing A.J.C. with Father was that the ICPC home study had turned up some "historical stuff" that made Nelson inclined to have Father evaluated for anger management and psychological issues. Nelson indicated the Department preferred A.J.C. remain with Grandmother, but would reassess its recommendations for placement if Father had those evaluations and addressed any issues that were uncovered. Nelson acknowledged, "Traditionally, the Department would try to reunify with the non-offending parent."
¶ 13 Father objected to the Department's position, noting the ICPC home study had revealed no concerns. He also indicated he was willing to continue to work with the Department under a treatment plan if A.J.C. were placed in his care.
¶ 14 A.J.C.'s counsel asserted that A.J.C. did not wish to live with Father; however, she conceded the Department was statutorily obligated to place A.J.C. in Father's care over Grandmother's.
¶ 15 At the close of testimony, the District Court upheld the Department's recommendation to leave A.J.C. with Grandmother until further order of the court. The court noted, however, that "in the long term [A.J.C.] is probably going to end up being reunited and living with his father ... given the preferences under the Montana code."
¶ 16 Thereafter, Father underwent a psychological evaluation at the Department's behest, although it had not been part of his treatment plan. The evaluator concluded Father was ready and able to parent ***14 A.J.C. immediately and that Father did not need to *63 make any changes before being an appropriate permanent placement for A.J.C. Despite this and despite the affidavit of Child Protection Specialist Kirk Israel of December 24, 2015, stating, "The Department has determined that [Father] is a safe and adequate placement and has no reason to deny placement of [A.J.C. with Father] at this time," the Department did not place A.J.C. with Father. Instead, on February 1, 2016, the Department filed a Motion for Approval of Parenting Plan in which it asked the District Court to determine if the permanency plan would be placement with Father or Grandmother in accordance with A.J.C.'s best interests.
¶ 17 On April 12, 2016, the District Court held a hearing to determine a final parenting plan and a permanency plan for A.J.C. The hearing encompassed not only the Department's pending Motion for Approval of Permanency Plan in this case, but also included argument and testimony regarding a petition to establish a parental interest Grandmother had filed, and proposed parenting plans which Father and Grandmother had filed in other separate but related District Court cases.[3]
¶ 18 On July 18, 2016, prior to the District Court issuing any rulings on the issues pending at the April hearing, Father filed a motion for an emergency status hearing. Father indicated the Department had advised him that it intended to place A.J.C. with him for a trial home placement, and Father asked the District Court to hold a status hearing prior to issuing its rulings on the issues argued at the April hearing.
¶ 19 However, prior to responding to Father's motion for emergency status hearing in this matter, on July 20, 2016, the District Court issued findings of fact, conclusions of law. and a parenting plan in the separate District Court case Father had filed. The court awarded Grandmother primary residential custody of A.J.C. and provided Father six weeks of parenting time during the summer.
¶ 20 On July 27, 2016, the District Court granted Father's motion for emergency status hearing in this matter, and set hearing for August 9, 2016. At hearing, Father argued that under § 40-4-228, MCA, the District Court erred by issuing an order in the parenting plan case prior to resolving this case. Father further moved the court to extend ***15 TLC rather than dismissing this case.
¶ 21 On October 24, 2016, the Department petitioned for extension of TLC, which the District Court granted.
¶ 22 On February 13, 2017, the Department filed a Motion for Approval of Permanency Plan in which it asked the District Court to approve the permanency plan of adoption by Grandmother. However, in the affidavit supporting the motion, CPS Israel again attested that placement was appropriate with either Father or Grandmother.
¶ 23 On February 28, 2017, the District Court heard the Department's request for approval of a permanency plan in which the Department clarified that it was not seeking adoption by Grandmother, but rather a "permanent placement" with Grandmother. At hearing, Father was represented by newly-assigned counsel, who requested additional time to brief Father's objections to the permanency plan. Although the District Court granted Father's request and issued an order continuing the hearing, it then further issued a written order approving permanent placement of A.J.C. with Grandmother.
¶ 24 Father continued to object to the permanent placement of A.J.C. with Grandmother. On April 25, 2017, the District Court heard argument regarding the Department's request for approval of a permanency plan. By this time, the Department had changed its position regarding placement of A.J.C., and it moved the court to approve an Amended Permanency Plan in which the Department unequivocally recommended placement of A.J.C. with Father. The Department argued that its previously proposed permanency plan, which sought to permanently place A.J.C. with Grandmother, was contrary to law. The Department stated it had no reason to deny placement of A.J.C. with Father. The Department argued Father has a fundamental *64 constitutional right to the care and custody of A.J.C. The Department supported its motion with an affidavit from Scott Warnell, Region VI Administrator for the Department.
¶ 25 At hearing, the District Court gave the parties additional time to respond to the Department's motion. However, the court further advised, "I've already decided ... that it is in the best interest of this child that he live with his grandmother."
¶ 26 After hearing, the parties filed briefs regarding the Department's motion, and Grandmother moved to intervene in this case. The District Court granted Grandmother's motion to intervene over Father's objection.
¶ 27 After the District Court granted Grandmother's motion to intervene, Grandmother filed a response brief objecting to the Department's motion to approve its Amended Permanency Plan. The ***16 District Court thereafter heard argument on the motion on July 11, 2017, after which it denied the Department's motion and dismissed this abuse and neglect action, thus leaving A.J.C. primarily in Grandmother's custody, with Father entitled to six weeks each summer. Father appeals.
STANDARD OF REVIEW
¶ 28 Whether a parent has been denied his right to due process is a question of constitutional law. Our review of questions of constitutional law is plenary. In re A.S. , 2004 MT 62, ¶ 9, 320 Mont. 268, 87 P.3d 408 (citation omitted).
¶ 29 We review findings of fact for clear error. A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces the district court a mistake was made. In re J.B ., 2016 MT 68, ¶ 10, 383 Mont. 48, 368 P.3d 715 (citations omitted). We review conclusions of law to determine whether the district court interpreted the law correctly. In re J.B. , ¶ 9 (citation omitted).
DISCUSSION
¶ 30 Did the District Court violate Father's constitutional right to parent by denying Father his fundamental right to care and custody of his child throughout this dependent neglect proceeding and thereafter by permanently placing A.J.C. in the primary care of his grandmother and dismissing this proceeding?
¶ 31 It is beyond dispute that the right to parent one's children is a constitutionally protected fundamental liberty interest protected by Article II, section 17 of the Montana Constitution and by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See Troxel v. Granville , 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000). This Court has repeatedly emphasized and upheld the constitutional protection of a natural parent's right to the custody of his or her child. In re J.N.P. , 2001 MT 120, ¶ 17, 305 Mont. 351, 27 P.3d 953 ; In re A.R.A. , 277 Mont. 66, 71, 919 P.2d 388, 391 (1996) ; In re A.S.A. , 258 Mont. 194, 852 P.2d 127 (1993) ; In re Guardianship of Doney , 174 Mont. 282, 570 P.2d 575 (1977).
¶ 32 The fundamental right to parent, however, may be limited by the State's responsibility to protect the welfare of children. Title 41, chapter 3 of the Montana Code Annotated provides the procedure by which the State may intervene in the care and custody of a child. This statutory scheme sets forth the criteria the State must establish to ***17 remove a child from a parent and terminate the parent-child relationship and the procedures which it must follow to do so. In this case, A.J.C. was in Mother's primary legal care. In response to reports against Mother including drug use, abuse, and distribution, and domestic violence, the Department filed a petition for EPS and TIA. The petition contained no allegations of abuse or neglect on Father's part. Although Father had largely been an absent parent, he immediately began pursuing custody of A.J.C. after the Department intervened and has steadfastly maintained those efforts over the past four years.
¶ 33 In January 2015, the District Court adjudicated A.J.C. a YINC under *65 § 41-3-437, MCA -a determination Father does not appeal. Once the District Court adjudicated A.J.C. a YINC, it could, and did, order treatment plans for Mother and Father. Section 41-3-443(1), MCA. Pursuant to § 41-3-443(2), MCA, a treatment plan must contain:
(a) the identification of the problems or conditions that resulted in the abuse or neglect of a child;
(b) the treatment goals and objectives for each condition or requirement established in the plan. If the child has been removed from the home, the treatment plan must include but is not limited to the conditions or requirements that must be established for the safe return of the child to the family;
(c) the projected time necessary to complete each of the treatment objectives;
(d) the specific treatment objectives that clearly identify the separate roles and responsibilities of all parties addressed in the treatment plan; and
(e) the signature of the parent or parents or guardian, unless the plan is ordered by the court.
¶ 34 When approving Father's treatment plan, the District Court specifically concluded that the plan "explained the problems/conditions related to the abuse/neglect of the child and set forth the goals/objectives that must be demonstrated by [Father] prior [to] the child's return...." Father's deficiencies as identified by his treatment plan were his "CPS history in Oregon (not involving AJC) and limited relationship with AJC." To satisfactorily address these deficiencies, Father was tasked with maintaining regular contact with A.J.C., participating in the Oregon ICPC home study and following all its recommendations, and maintaining contact with the Department. There is no dispute Father completed these tasks.
¶ 35 However, although Father successfully completed these tasks by July 31, 2015, the Department did not recommend that A.J.C. be ***18 placed with him, and the District Court refused to order such, instead ruling-against all evidence-that Father needed additional time to complete this treatment plan. The Department then raised concerns regarding potential anger management and mental health issues-issues the ICPC home report had considered and found not to be impediments to placement. Per the Department's recommendation, Father agreed to undergo a mental health evaluation. By October 2015, the mental health evaluator had also concluded that Father was presently able to parent A.J.C. Shortly thereafter, the Department acknowledged that Father was a safe and appropriate placement for A.J.C. However, the Department and the District Court still failed to place A.J.C. with Father. Instead, although the Department acknowledged in December 2015 that Father was a safe and appropriate placement, when it moved the District Court to approve a permanency plan in February 2016, it asked the court to consider both Father and Grandmother as potential placements.
¶ 36 There is also no dispute that the July 2015 ICPC report, the October 2015 mental health evaluation, and an updated July 2016 ICPC report[4] all concluded that Father was ready and able to parent A.J.C. However, the District Court then awarded primary custody to Grandmother in July 2016. In February 2017, the Department moved to make that arrangement permanent, but by the time the District Court heard the Department's motion, the Department had changed its position,[5] now recommending Father be awarded primary custody of A.J.C.
*66 ¶ 37 Again, rather than place A.J.C. with Father, the District Court sua sponte raised issues not identified by the Department and not mentioned or identified in the original treatment plan approved and ***19 ordered by the District Court.[6] These issues were known to the Department, and presumably to the District Court as well, in advance of the development and approval of Father's treatment plan. Had these been concerns which could potentially impede placement of A.J.C. with Father, the Department should have identified these concerns and provided Father with a means to address them in his initial treatment plan.
¶ 38 Complete compliance with a treatment plan is required, as opposed to partial or even substantial compliance. In re D.V. , 2003 MT 160, ¶ 27, 316 Mont. 282, 70 P.3d 1253 (citation omitted). Even if a parent technically completes all of the tasks in a treatment plan, he does not successfully complete the plan unless he effectuates the purposes for which the plan is designed. In re A.K. , 2015 MT 116, ¶ 28, 379 Mont. 41, 347 P.3d 711 (citation omitted). Here, Father completed the tasks and the purposes for which the plan was designed-strengthening his relationship with A.J.C., providing the Department with information to determine A.J.C. would be safe in Father's care, establishing a plan for reunification and permanency, and demonstrating the ability to provide a stable lifestyle. Thus, after Father successfully completed his treatment plan, the District Court erred by denying him placement of A.J.C.
¶ 39 Father also asserts the Department violated his right to parent by failing to provide reasonable efforts to reunify him with A.J.C. as required by § 41-3-423(1), MCA. The Department has a duty to act in good faith which does not end with the development and approval of a treatment plan. In re D.B. , 2007 MT 246, ¶ 33, 339 Mont. 240, 168 P.3d 691. Here, Father fully complied with, and successfully completed, his approved treatment plan. Secondly, ICPC approved him and his residence for placement and his psychological evaluation found no condition which precluded him from parenting. Finally, the Department itself determined Father to be a safe and appropriate placement. Despite this, the Department did not provide services to effectuate reunification. Instead, the Department complacently continued placement with Grandmother because she had been a long-time care provider for A.J.C. and A.J.C. expressed a desire to remain ***20 with Grandmother. We have previously held:
There are, however, few invasions by the state into the privacy of the individual that are more extreme than that of depriving a natural parent of the custody of his children. For this reason, the legislature carefully enunciated the procedures the state must follow and the findings which the court must make before custody of a child may legally be taken from his natural parent.
In re Guardianship of Doney , 174 Mont. at 285-86, 570 P.2d at 577. Once Father completed his treatment plan and the Department determined him to be a safe and appropriate placement, the Department failed to provide reasonable efforts to reunify Father with A.J.C.
¶ 40 Prior to initiation of this proceeding, Father was an absent parent, evidently content to permit Mother to parent so long as she was able. While unfortunate, such situations are not rare and the reasons for such are no doubt varied. When Mother became unable to parent and the State intervened, Father evidently determined it was time for him to parent. Again, it is not uncommon for previously absent parents to engage in parenting when the other parent is no longer able to do so. When the State decided to intervene, rather than rely on Mother to arrange for a third-party caregiver such as Grandmother, the State assumed a good-faith *67 duty to provide reasonable efforts to reunify Father with A.J.C. While Grandmother may have superior care-giving abilities and/or resources as compared to Father, such does not supersede Father's fundamental right to parent.
¶ 41 Father contends, "It is not the function of the State to choose better or different parents for children whose natural parents pose no safety risk, even where, in the State's subjective view, more desirable options may be available. Such a role is not to be played by the State even at the behest of children who may wish for different parents." We agree. Here, for almost four years-nearly one-third of A.J.C.'s life-the State and the District Court have unconstitutionally violated Father's fundamental right to parent.
¶ 42 Under the unique facts of this case, it was unnecessary to consider permanency as the DR case filed by Grandmother was the more appropriate forum. This matter is reversed and remanded to the District Court to enter an order accepting Mother's relinquishment and dismissing the action as the child is no longer a YINC at the time Father completed his treatment plan. Simultaneously, the District Court may consider DR 14-71, issue an interim parenting plan if the court deems it appropriate, hear Grandmother's petition to establish a parental interest and Father's and Grandmother's petitions for a ***21 parenting plan, and proceed accordingly.
CONCLUSION
¶ 43 The District Court unconstitutionally violated Father's fundamental right to parent by placing his child with Grandmother, a nonparent, and denying him placement after Father had successfully completed his court-ordered treatment plan. At that time, this proceeding should have been dismissed, leaving further consideration of the parenting relationship and parenting plan establishment in the DR matter.
¶ 44 Reversed and remanded for action consistent with this Opinion.
We concur:
MIKE McGRATH, C.J.
BETH BAKER, J.
LAURIE McKINNON, J.
DIRK M. SANDEFUR, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.

Both the present DN matter, In re A.J.C. , DA 17-0600, and the parenting plan case, Cromwell v. Schaefer , DA 17-0667, are before us on appeal. These matters have not been consolidated and this Court has issued a separate Opinion for each, although the facts of these cases overlap.

The District Court also approved a treatment plan for Mother. However, Mother ultimately relinquished her parental rights.

Father's and Grandmother's other actions were consolidated into one case by the District Court and are also before this Court on appeal. See Cromwell v. Schaefer , DA 17-0667.

Because of the passage of time, the ICPC home study which had been completed in July 2015 was now outdated, and in 2016, Father underwent an updated ICPC home study, which also found him a safe and appropriate placement for A.J.C.

In the District Court's subsequent Order Denying Department's Motion to Amend the Permanency Plan, it characterized the Department's change of position as follows: "The motion is not based on any new facts or change of circumstances, but apparently because the local department social workers, who have done an excellent job in this case, have been overruled by superiors in Helena, based on a new legal position that such children must be placed with the non-offending parent, without regard to the best interests of the child."

According to the District Court: Father had "essentially abandoned" A.J.C. prior to commencement of the DN case (although abandonment was not mentioned or alleged as grounds for the Title 41 proceeding); Father had "provided no financial support" (although Father had provided $5,429 in support since 2005 and had not missed a payment since March 2016); and Father's criminal history and difficulties with his oldest child (although the Department and the Oregon ICPC knew this information).