DA 19-0425

IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 126

FILED

05/19/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0425

IN THE MATTER OF:

D.D.,

      A Youth in Need of Care.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. ADN 19-1(B)
Honorable Elizabeth Best, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Jennifer Dwyer, Avignone, Banick & Williams, Bozeman, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Damon Martin, Assistant Attorneys General, Helena, Montana

        Joshua A. Racki, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs: April 15, 2020

Decided: May 19, 2020

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1     A.B.-A. (Mother) appeals from the termination of her parental rights to her child D.D. issued July 3, 2019, by the Eighth Judicial District Court, Cascade County. We reverse.[1]

¶2     We restate the issue on appeal as follows:

*Whether D.D. was properly determined to be an abused or neglected child.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3     Mother has a substantial history of chemical dependency issues, requiring intervention from the Department of Public Health and Human Services, Child and Family Services Division (the Department), in relation to her various children. Prior to this cause, the Department filed for intervention in 2015 regarding D.D. due to physical neglect, related to Mother's use of methamphetamine. At the outset of investigating that case, D.D. reported to the CPS worker that he missed school as he had to stay home to take care of his baby brother, C.S., as Mother slept all day. In addition to Mother's use of methamphetamine, C.S.'s father also admitted methamphetamine use. Both C.S. and D.D. were removed from Mother's care on May 8, 2015. D.D. was placed with his birth Father, R.D. Mother and C.S.'s father then completed treatment plans and C.S. was returned to their care. Mother and R.D. agreed D.D., then 12 years old, would remain in R.D.'s care and continue to reside with him and the cause was closed December 10, 2015. In

---

[1] We note there is companion case DA 19-0426 (*In re C.S.*) in which we issue a separate opinion.

May 2016, the Department received a report of domestic violence involving Mother, and C.S. was removed from her care on May 5, 2016. At that time, the State also filed a petition with regard to D.D.—DDN-16-153—in which it acknowledged "Birth Father [R.D.] has custody of [D.D.], and he has not visited Birth Mother in some time." The CPS affidavit in support of this petition did not contain any allegations of abuse or neglect by Mother in relation to D.D. Mother again completed a treatment plan and C.S. was returned to her care on April 10, 2017, and that cause was then closed. Within weeks, Mother relapsed on methamphetamine, and C.S. was again removed in June 2017. That cause was closed on August 31, 2018, after Mother completed inpatient treatment, and C.S. later returned to Mother's care. Apparently recognizing D.D. did not reside in Mother's home, but rather continued to reside with his father, R.D., the Department only brought its intervention petition in relation to C.S. On December 5, 2018, the Department received another report alleging Mother was using methamphetamine and domestic violence was occurring in her home. C.S. was again removed from Mother's care. At the time, D.D. was residing in Helena with his Father and was not in Mother's care and had not been so since May 8, 2015.

¶4 On January 4, 2019, the Department filed its Petition for Emergency Protective Services (EPS), Adjudication of Youth as Youth in Need of Care (YINC), Request for Finding of No Reasonable Efforts and Motion for Permanent Legal Custody, Termination of Parental Rights and Request for Hearing, wherein the Department alleged physical neglect and sought a finding from the court that it be relieved of the obligation to provide

3

reasonable efforts to preserve and reunify the family under § 41-3-423(2)(a), MCA. The Department contended a treatment plan was not required as Mother met the criteria of § 41-3-609(1)(d), MCA, by subjecting C.S. and D.D. to the aggravating circumstance of chronic, severe neglect, as provided in § 41-3-423(2)(a), MCA, by her continued pattern of relapse and domestic violence. The CPS worker's affidavit in support of the petition acknowledged D.D.'s father was his "primary caregiver" and admitted: "The only child currently living in the home with [Mother] is C.S. Both of her other children are living with birth fathers."[2] The supporting affidavit set forth no allegations of abuse of neglect in relation to D.D. since May 8, 2015, when he was removed from Mother's care and placed with his birth father in the prior action—ADN-15-130. Oddly, despite prior representations to the contrary in the Department's motions to close the prior causes and despite the CPS workers' supporting affidavits to the contrary when requesting the court close the prior causes, the State also alleged Mother had failed to successfully comply with her treatment plans previously ordered in her three prior DN cases—ADN-15-132, DDN-16-155, and BDN-17-185.

¶5     The District Court held hearings on the State's petition on April 25, 2019, and June 20, 2019. At the close of the June 20 hearing, the State admitted, "[D.D.] resides in

---

[2] It is noted Mother has a third child, E.F. The Department included E.F. in its 2015 and 2016 actions. Like D.D., E.F. has been in the care of his father since dismissal of the 2015 case, and like D.D., has had limited contact with Mother. E.F was not included in the litigation from which Mother now appeals.

4

Helena. He was not a participant in the BDN 2017 case, because he was residing with his father. And, what contact he's having with his mother was minimal at best, and he wasn't at risk. [C.S.] has been a child at issue in each of these cases." Ultimately, the District Court implicitly determined D.D. was an abused or neglected child, found the Department need not make reasonable efforts to provide preservation or reunification services, and terminated Mother's parental rights to both D.D. and C.S. Mother appeals.

## STANDARD OF REVIEW

¶6     This Court reviews a district court's decision to terminate parental rights for an abuse of discretion. *In re B.J.J.*, 2019 MT 129, ¶ 9, 396 Mont. 108, 443 P.3d 488; *In re A.S.*, 2016 MT 156, ¶ 11, 384 Mont. 41, 373 P.3d 848; *In re K.A.*, 2016 MT 27, ¶ 19, 382 Mont. 165, 365 P.3d 478. The Department has the burden of proving by clear and convincing evidence that the statutory criteria for termination have been met. *In re B.J.J.*, ¶ 9. In the context of parental rights cases, clear and convincing evidence is the requirement that a preponderance of the evidence be definite, clear, and convincing. *In re B.J.J.*, ¶ 9; *In re K.L.*, 2014 MT 28, ¶ 14, 373 Mont. 421, 318 P.3d 691. This Court reviews a district court's findings of fact for clear error and conclusions of law for correctness. *In re B.J.J.*, ¶ 9; *In re M.V.R.*, 2016 MT 309, ¶ 23, 385 Mont. 448, 384 P.3d 1058. "A factual finding is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence, or if review of the record convinces this Court a mistake was made." *In re B.J.J.*, ¶ 9. "To reverse a district court's evidentiary ruling for an abuse of discretion, this Court must determine the district court either acted arbitrarily

without employment of conscientious judgment or exceeded the bounds of reason resulting in substantial injustice." *In re B.J.J.*, ¶ 9 (quoting *In re I.M.*, 2018 MT 61, ¶ 13, 391 Mont. 42, 414 P.3d 797).

**DISCUSSION**

¶7    *Whether D.D. was properly determined to be an abused or neglected child.*

¶8    Mother asserts the District Court did not hold fundamentally fair procedures, erroneously finding D.D. to be a YINC based upon a stipulation Mother did not make. The State counters that adjudication of a child as a YINC is only required when termination is sought pursuant to § 41-3-609(1)(f), MCA. The State asserts termination pursuant to § 41-3-609(1)(a) through (e), MCA, only requires there be a "determination" that a child is abused or neglected. The State also asserts, "[t]he fact that D.D. was residing in another city did not mean he was unaffected by his mother's continual relapses."

¶9    As the care and custody of a child is a fundamental liberty interest protected by fundamentally fair procedures, termination procedures must satisfy the Due Process Clause of the Fourteenth Amendment. *In re C.J.*, 2010 MT 179, ¶ 26, 357 Mont. 219, 237 P.3d 1282. Sections 41-3-601 through -612, MCA, provide the procedures and criteria by which the parent-child relationship may be terminated. These provisions are only operative when there has first been a determination that a child has been abused or neglected as defined in § 41-3-102, MCA, or adjudicated as a YINC, depending upon which statutory basis is asserted for the termination. The threshold consideration when involuntary termination is sought pursuant to § 41-3-609(1)(f), MCA, is whether the child has been adjudicated a

YINC. An involuntary termination, however, sought pursuant to §§ 41-3-609(1)(d) and -423(2)(a), MCA, does not require that the child be adjudicated as a YINC, only that it be determined the child was abused or neglected. *See In re C.B.*, 2019 MT 294, ¶ 25, 398 Mont. 176, 454 P.3d 1195. Thus, the issue herein is whether the District Court properly determined D.D. to be abused or neglected while providing Mother fundamentally fair procedures.

¶10     "Child abuse or neglect" is defined as "(i) actual physical harm or psychological harm to a child; (ii) substantial risk of physical or psychological harm to a child; or (iii) abandonment." Section 41-3-102(7)(a)(i)-(iii), MCA. "'Physical or psychological harm to a child' means the harm that occurs whenever the parent or other person responsible for the child's welfare" subjects the child to one of the events or conditions enumerated in § 41-3-102(21)(a)(i)-(vi), MCA. "A person responsible for a child's welfare" means "the child's parent . . . who *resides in the same home in which the child resides*." Section 41-3-102(2)(a), MCA (emphasis added). [3]

¶11     The Department's policies go hand-in-hand with these statutory provisions. The Department's Philosophy Statement provides:

---

[3] The dissent misinterprets the plain language of § 41-3-102(2)(a), MCA. Further, the dissent asserts Mother did not reside in the same home as D.D. because she neglected her responsibility to provide for his welfare. Such assertion, ignores the Department's dismissal of the 2015 case as Mother had successfully completed her treatment plan and addressed the issues which initiated the Department's involvement, and it also ignores that D.D. was not residing with Mother as she agreed to and followed a de facto parenting plan, which provided for D.D.'s ongoing safety, care, protection, and welfare by residing with his father.

It is the Division's mission to keep children safe and families strong. Safety of the child takes precedence over all other decisions surrounding child protective services. At the time of investigation, a child may be considered safe when there is an absence of serious threat of harm or when the threat of serious harm to a child is controlled by a response to an unsafe situation; in other words, a child may be considered safe when no present or impending dangers are identified through the investigation/assessment protocols and policies.

Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/YV9G-NNDM. Department policy 202-3 provides, "[a]ll reports indicating reasonable cause to suspect that a child is abused, neglected, or abandoned *by a person responsible for the child's care* must be assessed." Child and Family Services Policy Manual, § 202-3 (DPHHS 2015), https://perma.cc/6ZNV-H6AT (emphasis added). The policy explains: "*Person responsible for a child's welfare means* the child's *parent*, guardian, foster parent or an adult *who resides in the same home in which the child resides.*" Child and Family Services Policy Manual, § 202-3 (DPHHS 2015), https://perma.cc/6ZNV-H6AT (emphasis added). Importantly, the policy clarifies: "**[T]he Division does not have legal authority to investigate alleged abuse or neglect when the alleged perpetrator of the abuse or neglect is not a person responsible for the welfare of the child who is the subject of the alleged abuse or neglect**." Child and Family Services Policy Manual, § 202-3 (DPHHS 2015), https://perma.cc/6ZNV-H6AT (emphasis in original). Investigation of a report of child abuse and neglect against a person responsible for the child's welfare then requires the Department to establish the "Safety Threshold" to be met—a present, immediate, observable danger to a vulnerable child,

8

which is not controlled. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/YV9G-NNDM.

¶12 Here, since May 2015, a de facto parenting plan has existed, whereby D.D. has resided with his father on a continuous basis in another city. D.D. does not reside in the same home as Mother and has not done so since May 8, 2015. Mother's neglect of D.D. was resolved upon D.D.'s placement with his father and dismissal of the 2015 case—ADN-15-130. At the outset of this cause—under the Department's philosophy and policies—there was no present, immediate, observable danger to D.D.—who at 16 years of age was not shown to be vulnerable—which was not controlled.[4] The threat of harm to D.D. was absent or controlled by D.D. being 16 years old and residing with his father in another city. The State cannot rely upon an adjudication as a YINC or a determination of being abused and neglected made in a prior case—which was dismissed on the basis the offending parent completed his/her treatment plan and addressed the safety concerns which initiated the case—to support termination of parental rights in a subsequent litigation. Such would be fundamentally unfair and violate a parent's due process rights.

¶13 The District Court erred in determining D.D. to be an abused or neglected child in this cause—the threshold determination required to terminate parental rights. As such, the

---

[4] The dissent asserts "common sense" as support for its assertion D.D. was a neglected child. But it is clear any neglectful behavior on Mother's part, which resulted in initiation of this cause, did not result in an immediate, observable danger to D.D., now 17 years old and living in another city. If the Department followed the "common sense" asserted by the dissent, it would be overwhelmed seeking termination of non-custodial parents on the basis of neglect.

District Court also erred in terminating Mother's parental rights to D.D. Thus, we reverse the termination of Mother's parental rights to D.D.

**CONCLUSION**

¶14 It is clear Mother's inability to successfully address her ongoing substance use disorder has no doubt significantly affected D.D. It is possible he may continue to choose not to have a relationship with her even if she is able to successfully address her substance use disorder in the future. That will be his choice. Regardless, under the circumstances here, D.D. was not residing with Mother at the time of her alleged neglectful conduct and, given the agreed upon de facto parenting plan, was not at risk of doing so. As such, D.D. was not an abused or neglected child as provided in § 41-3-102(2)(a), (7)(a)(i)-(iii), and (21)(a)(i)-(vi), MCA. Thus, the termination of Mother's parental rights to D.D. is reversed.

¶15 Reversed.

/S/ INGRID GUSTAFSON

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

Justice Beth Baker, dissenting.

¶16 How can not parenting one's child for four years *not* be neglect?

10

¶17  We construe a statute "to give effect to [its] purpose . . . and avoid an absurd result." *State v. Nelson*, 2014 MT 135, ¶ 17, 375 Mont. 164, 334 P.3d 345.  Analyzing whether Mother abused or neglected D.D., the Court leaves out words in § 41-3-102(2)(a), MCA, that are critical to its construction and necessary to give effect to its plain meaning.  That subsection of the statute states in full: "'A person responsible for a child's welfare' means: (a) the child's parent, guardian, or foster parent or an adult who resides in the same home in which the child resides."  The Court's ellipses (Opinion, ¶ 10) lead it to read the statute to require that a natural parent must reside in the same home in order to be responsible for the parent's own child.  Such an interpretation of the statute is at odds with the law, with ordinary grammatical construction, and with common sense.

¶18  First, since statehood, Montana law has obligated parents to provide support and education of their children.  *See* § 40-6-211, MCA.  "A parent's duty to support and maintain a child is not abrogated by the child's abandoning the parent's home or by any other voluntary act unless a court has determined the child to be an emancipated minor not in need of parental support."  Section 40-6-215(3), MCA.  Both historic and modern state law recognize the parent's responsibility for her child's welfare until the child is emancipated and self-supporting (*see* § 40-6-214, MCA; *V.L.-S. v. M.S. (In re M.A.S.)*, 2011 MT 313, 363 Mont. 96, 266 P.3d 1267) or the parent's rights have been relinquished or terminated (*see generally* Title 41, chapter 3; Title 42, MCA).  *See also Chrestenson v. Chrestenson*, 180 Mont. 96, 99, 589 P.2d 148, 150 (1979) (parents obligated for support until child becomes adult at age 18).  The constitutionally protected status of the integrity

11

of the family unit bestows a parent with fundamental rights, *In re B.H.*, 2020 MT 4, ¶ 39, 398 Mont. 275, 456 P.3d 233. And it imposes corollary obligations that protect the child's likewise fundamental rights. *See In re C.H.*, 210 Mont. 184, 683 P.2d 931 (1984). The fundamental right to parent may be limited by the State's responsibility to protect the welfare of children. *In re A.J.C.*, 2018 MT 234, 393 Mont. 9, 427 P.3d 59. Title 41, chapter 3, MCA, implements that responsibility, and we must construe it to effectuate the statute's purpose. Construed as a whole, Montana statutes make clear that a child's parent is responsible for the child's welfare.

¶19    Second, in ascertaining a statute's plain meaning, "we have 'long adhered to ordinary rules of grammar.'" *Bates v. Neva*, 2014 MT 336, ¶ 15, 377 Mont. 350, 339 P.3d 1265. Under rules of grammatical construction, the series-qualifier canon of statutory interpretation presumes "that when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *Series-qualifier canon, Black's Law Dictionary* 1574 (10th ed. 2014). This presumption applies, however, "only where the items in the series have parallel construction. If the items do not have parallel construction because a modifier is interspersed between them, the result is that the pre-positive modifier applies only to the first item in the series and does not carry over." *Bates*, ¶ 16 (internal citations omitted). In *Bates*, we held that a phrase in the Montana Human Rights Act referring to "housing accommodation or improved or unimproved property" did not limit "improved or unimproved property" to housing

property because "housing" did not modify "improved or unimproved property." *Bates*, ¶ 16. Because of the like placements of "or" in § 41-3-102(2)(a), MCA, the same principle applies to the post-positive modifier here. The statute refers to a "parent, guardian, *or* foster parent *or* an adult who resides in the same home in which the child resides." Section 41-3-102(2)(a), MCA (emphasis added). Under ordinary grammatical rules, residing in the same home refers only to an "adult" *other than* a parent, guardian, or foster parent (each of whom is obligated by law for the child's welfare).

¶20 The Court also emphasizes the Department's dismissal of the prior youth in need of care proceedings after D.D. went to live with his father in 2015. Opinion, ¶ 12. But § 41-3-423(2)(a), MCA, permits the trial court to find reunification services unnecessary if it finds that the parent has "subjected *a* child to aggravated circumstances, including . . . chronic, severe neglect of *a* child." (Emphasis added.) "A showing that the prior aggravated circumstances are relevant to the child at issue is not required." *In re L.N.*, 2014 MT 187, ¶ 23, 375 Mont. 480, 329 P.3d 598. Dismissal of the prior case involving D.D. does not render clearly erroneous the District Court's finding that Mother had subjected a child to chronic, severe neglect.

¶21 Finally, there is common sense. Mother did not reside in the same home as D.D. because she had neglected her responsibility to provide for his welfare. She continued to neglect him from the time he was removed from her care in 2015 until the Department sought termination of her rights.

13

¶22 Today's Opinion eschews common sense and renders the child abuse and neglect statutes absurd. The District Court's order terminating Mother's parental rights should be affirmed.

/S/ BETH BAKER